In our final case today, we have the United States v. Nathaniel Martin. Mr. Coleman, you represent Mr. Martin? Yes, Your Honor. Good morning. May it please the Court, with the briefing, my estimation, the final decision in this case comes down to one passage out of Rodriguez. Rodriguez does say that officer safety interests stem from the mission of a stop of a traffic stop, and that they are especially fraught with danger to police officers. That's well accepted in the circuit. This Court recognized it even in Palmer. But Rodriguez also says that on-scene investigation of other crimes detours from that mission, and so too do safety precautions taken in order to facilitate such detours. My submission in this case on behalf of Nate Martin is we're in that second part of Rodriguez. I recognize what Palmer says, but in this case it initiated with the gun investigation. The parties in the vehicle had already engaged the forestry officer 45 minutes before what's been called the second stop in the briefs. They knew his authority or claimed authority. They recognized him. They conversed about what was there. He testified. He told them not to park on the side of the road, even though it wasn't in his narrative report. He came upon them again after routine patrol on that road in the National Forest, after telling them they could have a gun there. West Virginia is constitutional carry now under 6177C. So when he learned at the very beginning, the first question, which really we wanted to ask in every traffic stop, great, she had a gun. It was under her seat in the car. He didn't pursue that any further except to ask her four more times after she answered him. While she was getting her license and getting her registration and her insurance documentation, which he did not even investigate, he said, gosh, I'm out in the woods. It's hard to call any of it in. So he was going to be satisfied just looking at the insurance and the registration. He got that less than three minutes into the body cam video. And then he spent the whole duration of the stop getting my client's ID, who was a passenger. He pulled up and immediately started asking about the car when they were observed outside the car. Do you think that the presence of them being outside the car should change the court's analysis here? No, ma'am, I don't, because they weren't free to leave either way. And he premised the whole encounter. In terms of the safety, the officer's safety argument, I guess is what I mean. It's stronger. It's not like in Buzzard where the two people were in the car and the officer was asking through the window and in checking had found out a lot of things about that Martin passenger in that case. So, sure, I think it helps here. It helps your client, you mean? Yes, ma'am. He could see their full bodies. Could you recount all of the many ways in which this record seems to me to demonstrate that this officer did not feel that he was in any danger and, in fact, said he wasn't? Oh, gosh. He did not even really react when told there was a gun under the driver's car. He did not immediately secure it. He allowed her to reenter the car two times further than arm's length away, where had she reached up under the seat to do something with it, he couldn't prohibit her. He was in his tack gear. I don't recall if he was armed. Government counsel may be able to answer that. But then looked at the gun briefly at, like, the five-minute mark in the body cam, put it back down on the seat. Well, she didn't secure it. Go ahead. She says something about he asked her if she had a concealed weapon permit, and she said something about the new law. And that's correct. That was 6177C. And he says that's right, and then he puts the gun back down. Yes, ma'am. He leaves both guns there. Right. Like you said, he doesn't secure them, doesn't clear them. And, in fact, testified that he did not feel he was in danger.  He went three car lengths away back to his truck to take pictures of their driver's license on the hood of his car, at one point with his back turned to it. And left the guns with them. Left them in the car. And simply verbally said, y'all don't get in the car. And, of course, they complied. They were outside the car when he pulled up. So the emphasis on the inside of the car when he's investigating what? Blocking the bridge. I saw no investigation of the traffic violation at all. I saw him going through the officer's laundry list. Well, here are the things I can do since I have a traffic violation. I thought they were blocking the bridge. They were. That's not in dispute. He didn't check to see if they were intoxicated. Wasn't that a traffic violation, blocking the highway? Yes, sir, it is. It is? Yes, sir. That's not in dispute. You mean that he stopped them for blocking the bridge, but then he didn't investigate anything about blocking the bridge.  He went straight, he hauled straight off asking about firearms five times. Exactly. And what concerns me, the district court seemed to take the position, well, this is a constant, well, this is, do you have any guns is going to be part of every traffic stop. And while Rodriguez does talk about, yeah, you can do some safety precautions to ensure you can have a safe traffic mission continued. Do you have a gun every time is not part of it. The officer has to do that, not just protect himself, but to protect the people in the car and anybody else around. You don't want an incident coming up as a result of somebody pulling the gun on you. Well, that's the danger. That's what the thing is all about. And that's what Judge Berger basically said. In every case when here they were outside the car. So what was in the car didn't even matter. They weren't visibly armed. And Mr. Martin on the video, he's, he's like, I don't know, pacing or something further away from the car. He's not even in on a video. It appears he she's, she's close to the car, exactly. But he's out in front of the car pacing. I mean, are doing something, but he's probably, I don't want to say not in close proximity to the car, but definitely not in close as close proximity as she is.  To the guns in the car. She was being evasive in answering his question. He didn't know that until he asked her five or six times, five times. Your Honor. That's maybe the reason he asked her five times. But what was the reasonable suspicion? And she admitted she'd been lying to him. And she admitted also at the very beginning, I have a gun under my seat. Well, and she didn't admit that there was a gun under the other seat. That's true. That's supported. She was lying to him. She was also looking for her registration and insurance for three of those additional questions, but it turned those over to him. So that let's construe it that way. He didn't know that. Are we going to do this in every traffic stop? We're going to ask you the question once about a constitutional right unrelated to the reason of the stop. And just keep hammering it. What? He didn't even articulate a basis for not liking the answer. What he did admit later is that, yeah, I stopped him from being stuck on the bridge, but I'm looking at ginseng. He's a forest ranger, and I've seen this mentality in cases. They believe everybody out in the woods who's not doing something they understand is illegally ginseng. This was in the national forest. Yes, sir. Partially inhabited. Hardly anybody out there. Yes, sir. Miles and miles from a community. Yes, sir. I mean, you and I know where that is. Yes, sir. Cranberry Glades. Yes, sir. This case is certainly distinguishable by Palmer. There weren't five air fresheners hanging in the car. There wasn't an excuse to go in and mess with the registration on the windshield, and there wasn't the perception of marijuana. There wasn't a PO box and a driver's license, which I've never heard of that being a problem, but apparently that was justifiable in that case. He's one officer by himself with two people in a car. He naturally wants to be safe. Yes, sir. That's not an excuse. He acted consistent with that proposition. He didn't feel unsafe. He admitted that. He wasn't concerned about anyone pulling a gun on him. He wasn't worried about it. Based on the recitation of facts you just went over earlier, he acted inconsistent with that premise.  That's the reason he asked her five times if there was another gun, because he suspected she'd lie to him. He asked her five times because he thought there was ginseng in the car and wanted to explore something else. And the fifth time she admitted there was another gun in the car, and he's a felon. Well, that did turn out that way, as it turns out. What did he testify was the reason he asked her five times? He didn't. He just kept asking. Nobody asked him at the hearing why he kept asking? We didn't develop why so many times. It was more I felt important to develop. He didn't suspect them of any violations other than being stopped on the bridge. Well, you were just saying that he was asking her five times because of the ginseng, but that's not in the record? No, ma'am. I thought he was asking her five times because she was talking quietly or something. No. He asked five times. He admitted later he had talked about, yeah, I encountered them because of the stop on the bridge, but I'm always looking for ginseng. And the structure of the questioning is consistent with that later representation on cross because there was no justification to keep asking the question. There was nothing in her behavior that was prompting it. There was nothing Mr. Martin's behavior. So it's the fact that he testified that he was always looking for ginseng, and they were in the woods, that that's where you're getting the inference that that's why he asked her five times. Yes, ma'am. But why wouldn't he ask her if there was ginseng instead of if there's firearms? Ma'am? Why wouldn't he ask her if there was ginseng in the car then instead of if there was firearms in the car? Because these officers have been told they can ask safety questions during a stop to prolong it and avoid the consequences. Wait, where are you getting that? Who told, where in the record is it that somebody has told these officers to ask questions to prolong the stop? I didn't develop that. I'm inferring that. Okay, so you're just, okay. Yes, ma'am. I mean, we've got the cross where he really displayed that he had no other suspicion of anything going on other than being stopped improperly on the bridge. Before the audio kicked on on the body cam, she admitted she had a firearm. They discussed it, and as you observed, there was no indication she had it unlawfully. He didn't ask her about it. Well, the main thing is he left it in the car. Yes. And he left it uncleared, and he allowed them to meander about the car with now two firearms in the car. And thankfully, and what I also believe supports my client's case, is that they didn't behave in a way that indicated they were a danger to him. So much so that he drove them down the road to the reunion they were heading to. Exactly. He was really in fear of them, wasn't he? So besides my client winning or having this ruling reversed, what I'm desperately hoping the court does not do is adopt a per se rule that, sure, it's fine to ask about a gun in every case because the circumstances under the totality of the circumstances doesn't justify and warrant that in every case. Rodriguez recognizes, and there are instances where, with a traffic stop, yes, it's a mobile vehicle. People are concealed in a part where you can't see their body. They're in a car or a vehicle. Say it's a truck. But just as with a home, even when you can't frisk someone walking out without a reasonable suspicion, it's still the Supreme Court law. It's by the totality of the circumstances, case by case. And that doing the firearm inquiry is broadening the safety concern, which is legitimate. But broadening the safety concern so much, where do you stop? If it applies here for guns, if you rule today that it's an ordinary incident with a traffic stop, we can do it every time, then widen the frisk. We already have Supreme Court authority saying that an officer can remove. Do you have drugs in the car that might harm me, or drug needles in the car that might harm me? Well, you already ruled in Buzzer that that was okay under the facts of that case. And I've had cases where officers start off going, there's no fentanyl in this, right? They find some drugs in the car, and they want to process the evidence. And they're asking them because they don't want to have a contact because they bought into that fentanyl can do the contact overdose. That's not scientifically supported, but they certainly believe it. I've seen them have panic attacks coming into contact with it. But that goes into, in that particular context, with that traffic stop, there's a mission to process why did that traffic stop require that. If they've gotten to where they're asking about drugs, there's more going on. And no, that is a separate criminal investigation under Rodriguez. Again, if you smell the marijuana, that's different. We saw that in Palmer. I think it's Palmer, I'm sorry. It may be Buzzard. I don't mean to conflate the two, but you understand what I'm saying. I am just about out of time, so are there any other? I'll save it for the rest on the end. Thank you for your attention. Thank you, Mr. Coleman. Appreciate you. Mr. Randolph, good to have you with us, Mr. Randolph. Thank you, Your Honor. May it please the court. As you know, as you are aware, traffic stops are especially fraught with danger, and that's where this case begins. It's not that the officer himself feared at a particular time that his safety was at risk. It's the circumstances surrounding this stop from the beginning. As Judge King pointed out, we're in the Monongahela National Forest. Out there, there's no homes. So you're not advocating. You're focusing your argument on the totality of the circumstances in this case, and you're not advocating that law enforcement can just roll up to every car in every stop and first question ask if there are firearms in the car. That was not my position in our brief, Your Honor.  Now, that may be the practical circumstances at the end of this once I started thinking about it, but, no, that's not what I advocated. So you're focusing on the totality of the circumstances here and the fact that it was in the forest and he was alone and there was no cell service and he was outnumbered. Outnumbered, limited radio communications, and here's the officer's safety issue.  So what are we to do? And most everybody in the National Forest had the guns. And unbeknownst to him, there were two people in this particular car that had a firearm. Right. But then when he determined that there were two guns in the car, he left the guns in the car. He didn't secure the guns in any way. He didn't secure the people. He meandered about, turned his back to him. He, in fact, testified at the hearing that he did not feel like he was in danger, and he certainly didn't act like he was in danger. I understand your argument about the inherent danger to law enforcement of traffic stops, but the totality of the circumstances and the facts and the conduct and the behavior of the officer here belie that in this case. Your Honor, I want you to think.  Yeah, but the fear of danger can be mitigated and minimized through training and experience. And if you look at the record and the testimony about Officer Radford's training, he's an ex-Marine. Does it matter that they were standing outside the car? I don't think in this circumstance it matters at all that they were standing outside the car. And she didn't go back in the car until he told her to grab certain things out of the car. Correct. Yeah, so they were both, when he pulled them over, they got out the car. He didn't really ask anything as to, she volunteered a lot of information, but the first thing he kind of asks is, do you have a gun or a weapon? But he doesn't ask about, why are you blocking the roadway? Mr. Martin is probably, what, six, seven feet away from the car. He's up there pacing or doing something. I don't want to say pacing, but he's not in close proximity as she is to the car, right? Yes, Your Honor. You would agree. So in terms of the argument regarding Officer's safety, would that make a difference that he's not in the car? Had they been in the car, would that have made a difference? He says that makes his case even stronger, the fact that they were outside the car. Well, again, at this point the officer doesn't know anything because in his initial encounter he doesn't know if they have firearms on them or in the car or anything. So the initial encounter, before the officer even got out of the car and met with Ms. Jarvis, who was the driver, Mr. Martin had already exited and went over to the bank and was coming back up. The district court found that that initial encounter involved three things. It involved an explanation of the basis for the traffic stop. It involved a question about the presence of firearms. And then it explained or requested her driver's license. And that's when they moved towards the car, the officer and Ms. Jarvis. And you're right, Mr. Martin does stand off to the front of the car. And it's kind of steering clear of that particular conversation. Now, there were five questions here, not to split hairs. There were four questions about it. So the first one was, do you have any firearms in the vehicle? That was at the initial encounter. The next question came as they were walking to the car, and that was, is there anything else in the car, for which Ms. Jarvis didn't answer. The second question was, ma'am, was there anything else in the car? Because he was looking for the ginseng. He was not looking for ginseng, although he did say that in his, you know, in a body cam of why he's waiting on the driver's license and criminal history check to come back. He explained to them, hey, you know, I'm out here doing some ginseng work. I have it in these particular hollows in the National Forest. But he said, actually, the reason why I stopped is because – Now everybody out there is saying they're looking for ginseng. That's correct. And he actually even testified at the suppression hearing that he didn't have ginseng in those hollows. He was just trying to make small talk and try to see if there was anything else going on at that time. Very important, very important, Your Honor. That sounds like prolonging the stop for no reason. Except for Judge Berger said that did not prolong the stop because while those – I know, and that's what we were viewing, but go ahead. But while that questioning was going on, Your Honor, he was waiting for the operator's license check and the criminal history check to come back from Nicholas County 9-1-1. So she found because of that, there was no prolonging of the stop. Similar to the questions following the initial question about the presence of the firearm, she said those questions took place during the necessary functions of the traffic stop. And because of that, it did not unlawfully prolong the stop because at the time they were still working towards getting license registration and insurance. So those are two important findings that the court made that should bear weight on the decision. And he got a response that there was a felony conviction. He did. When the criminal history check came back, actually the first thing that came back from 9-1-1 was Mr. Martin had a felony conviction in his record. And that was 10 or 12 minutes or something? So I believe that was in the range on the video of about 12 minutes into the stop. There were approximately two minutes that the officer testified, around two minutes that were unaccounted for because the video body camera was warming up. So then what did he do? Upon finding the criminal history of Mr. Martin, at that point he essentially took a little more control of the scene and placed Mr. Martin in cuffs and indicated he was going to arrest him for being a felon in possession of a firearm. But back to the circumstances. Maybe he took him to a picnic. I must say Officer Radford was a good old country law enforcement officer, and yes. He did return him to the picnic. I just thought that was a West Virginia thing. Yeah. He was definitely a good old country law enforcement officer who would not have been in fear in the forest, even alone. And, in fact, said he wasn't in fear. And you said he was a Marine, which is another reason he didn't feel like he was in danger. Yeah, so he was a Marine. He had in his history he was a— Right, so he was completely comfortable in that environment, looking at the totality of the circumstances. That's his job, yes. I think there's every indication he would have been completely comfortable in that environment. But it doesn't change the fact, when you look at the decisions of this court and the Supreme Court, when it talks about traffic stops being especially fraught with danger. About every court in the country said that they're in a very serious period of time. Yes, Your Honor. About every circuit that said they could do what they did here, what he did here. But that goes back to my first question. I mean, so then you are advocating that in every stop, regardless, in every traffic stop, first question, are there any firearms in the car? Your Honor, I couldn't think, as I'm sitting here, of a less burdensome precaution than a police officer. Except that's just the beginning. What about, all right, no firearms? Is there any fentanyl in the car? Because that's dangerous to law enforcement. I mean, there's no limiting principle to your reasoning. Well, there is a limit, and that limit is. Firearms, just firearms. Actually, no, I'm not, I wouldn't articulate that. I think the limit is, is the question for officer safety, or is it for an unrelated criminal investigation? Well, but you said every traffic stop is inherently dangerous. So that would mean that question, per your argument, is for officer safety. So then that would necessarily mean that they get to ask it every time for every traffic stop. And I'm just asking what the limiting principle is there. Is it just they can ask about firearms and nothing else? Or do we go, the next step is going to be, I'll be up here asking about fentanyl at every traffic stop. Well, there may come a time, I suppose, when fentanyl could be the next issue. Okay, well, that's a problem. Today is, I understand, but today is a firearm question, Your Honor. And certainly there's less things more dangerous to an officer than a firearm that he doesn't know, he or she doesn't know about. It's not just the safety of the officers, it's the safety of the folks in the car and the public generally. Correct. Everybody involved in the traffic stop. Everybody involved, everybody around. You don't want to get people shooting guns. Where in the record, where can I find where this officer said he felt unsafe? Where he felt unsafe? In the circumstances of this traffic stop. So in his testimony at the suppression hearing, he did testify that he did not feel, at the time Ms. Jarvis was getting into the car. He said that safety was always at the forefront of his mind. Yeah. He did testify to that. But he also did say at the time Ms. Jarvis was getting into the car, he testified that he did not feel his safety was at risk. Right. He did not feel he was in danger. Correct, Your Honor. When she was in there getting in the car that he knew had a firearm. At that time. And, of course, he also testified. When did he decide that he might feel he was at risk? After the attorneys got involved? No, I don't think. I mean, it's how he felt at the time. It's how he felt at the time. He did not feel in danger. I think importantly here, though, the case law doesn't seem to suggest that his subjective feelings is important when it comes back to the officer's safety. Right. And then that goes back to my whole thing about how. How broad. It has to be that you're advocating for that an officer can ask straight away in every traffic stop, is there a firearm? And the reason is because traffic stops are inherently dangerous for officers. And, I mean, that can be your argument. I think there's case law that would support your argument. I just want to understand your argument. I think that's a fair conclusion of where I'm getting to. Like I said, originally I didn't argue that that should be a per se rule. But when I started preparing for today's, I think that was a practical circumstance of what could happen here. And if it's a question for officer safety, then it's a negligibly burdensome precaution that an officer can take during a traffic stop. How does that work? You know, I'm curious because I'm from South Carolina and we have an open carry law. So if she says that, and I'm assuming that's in West Virginia, the same case, she says he initially picks up the gun and then he puts the gun back down after she says, he says you have a permit. And she says I don't need one because of the new law is basically what she says. So does he have the right at that point to go run the serial number? I mean, like once officer safety, he just at this point, you're just saying he just needs to know that there is a gun in the car. I think that's the key. Knowledge is the key for the safety of the officers and everybody else in this particular circumstance. Even at that point, I think importantly, you know, Officer Radford still believed these people to be law abiding citizens. He had no reason to believe that either one of them couldn't possess. He was telling them they could shoot in the National Forest even after learning of the second. So yeah, that is, it's the knowledge of it. And he did start to have concern once the information came that there was a second firearm after he'd asked two other times and got some evasive responses. And so then what did he do? Leave the firearms in the car? He did not even get the second firearm. The first one he testified that he believed he set it back down on the seat. He did not recall taking it back to his right. So that doesn't indicate he feels concerned. He left the firearms there. But what he did unsecured, uncleared with two, two people. But what he did do, he did do a couple of things wrong. And and I think Judge Berger made an important footnote in her order. The things that he did was he used verbal commands to ask them to stay away from the car, which they did. They complied. No reason to amp it up beyond that in his circumstances. So they complied with his verbal commands. And he also, when he went back to his vehicle, he said he kept himself in a position, one, of cover in case either one of them would try to get to the car. And two, so that he could visibly watch him as he was running. Didn't he have his back turned at some point? He had to walk away from him, but he also testified that he was looking over his shoulder to, you know, to keep, to keep them in his sight. So he did do a couple things. And Judge Berger, you know, pointed out that just because he didn't take every step that anybody else looking at the case should have taken, it doesn't mean that he forfeits all the things that are otherwise available to him. And that's a certain precautions that have been authorized. And so if no other questions, I would just sum up by saying the judge did not make clear error in saying that the question was for officer safety and that nothing throughout prolonged this stop. And we would ask that you would affirm her motion for her order denying the motion to suppress. Thank you, Mr. Randolph.  Mr. Coleman? Yes, Your Honor. Briefly, a couple of things. Going through these questions, she did do answer them. If you look in the joint appendix, JA112 through JA, you can go all the way through 124. That's the transcript of the body cam video at 31 seconds. You don't have anything else in the vehicle. Jarvis says no at 33 seconds. So there's nothing else in the vehicle at 42 seconds. At 44, Jarvis says uh-uh. And then at 48, ma'am, there's nothing else in the vehicle. Jarvis says no. So she was answering his questions and denying it. And you're right, Judge King, she changed her answer later in it. But up to that point, she was continuing to answer the questions, and nothing about what she said was suspicious or inconsistent with her prior answers. The idea about the license check, there was no license check in this case. That's why I said, Rodriguez says you either have to not extend the stop or at least complete the stop in the amount of time necessary to investigate the mission of the stop. The mission was, why were you pulled over? Did he inquire about if there was something going on between the two occupants of the vehicle? No. Did he observe to see if there was any trauma, any bad behavior? Any manifestation of a characteristic that they should have been stopped in the middle? Didn't even ask why they were there. Were they taking a picture? Were they smoking a roach? Were they avoiding a deer? Why were they stopped? Nothing. Hadn't they discussed earlier why they were stopped, though? Weren't they looking for mushrooms? That was 45 minutes before. So they were probably still looking for mushrooms. Well, that may have been a supposition. But the point is he didn't even ask or investigate the purpose, the traffic violation at all. He called in a 27, which he said.  Sir? At 1225, the dispatch radioed Radford that Mr. Martin had prior felony convictions. Yes. The dispatcher did not report back on Ms. Jarvis' driver's license. That's true. And Mr. and Officer Radford then requested the dispatcher to send another officer in his direction. Which he never . . . That's from Judge Berger's opinion. Correct. He said they didn't do a driver's license check. That doesn't . . . And Judge Berger . . . That's not consistent with that. Judge Berger . . . He didn't report back at that point, I guess. But he did come back and say that the passenger had felony convictions. She's got an S on convictions. And then at the joint appendix at 124 with Judge Berger's findings, she also expressly found that Radford did not feel the safety was at risk, even after that. And the lead up is at 5 minutes and 17 into the body cam footage, when he's saying he's calling in a 27, which is the joint appendix at 85 and also at 87. Again, he acknowledged on cross. They never gave him anything about the driver's license being valid at all. Instead, he called in and said, Could you verify neither of those are prohibited persons, please? That's the only response dispatch gave. Because there wasn't another basis. I will give this explanation. It's not in the record. My investigator in this case is a former South Charleston police officer. He disputed that a 27 was a 27 the way this forestry officer characterized it with dispatch through some of them. It's not in the record. But what was significant to me when I didn't have a witness there to contradict the testimony, it wasn't previously in a report, was that whatever he said a 27 meant, it didn't happen that way. He never verified that license as to its validity. He was willing to accept the registration and insurance looking at the physical car. He took a picture of the driver's licenses and took a picture of the tag on the car. So I submit to you, he wasn't really seriously investigating the traffic stop at all. So I don't want to belabor that, but I ask that you consider it. You lapsed into being an expert witness here. Sir? You changed from being a lawyer to being an expert witness. Well, let me switch hats. Your Honors, the worst thing to come out of this case, on top of my client continuing to lose it, would be if a traffic stop becomes a general warrant to investigate anything that could be lumped into some massive cloud of safety, officer safety considerations, because there's no limit on that. I brought that up. We've got court law limiting when we can frisk somebody, how we get them out of the car, things we need reasonable suspicion for. You want a limiting principle, okay? That red light came on you. Yes, sir, it did. It says 25. Oh, I'm going over. Oh, it's going over. Anyway, that's what I would ask that you entertain with this and avoid coming out of it. Thank you. Thank you. We'll adjourn court for the week and come down to great counsel. This honorable court stands adjourned. Time to die. God save the United States and this honorable court.
judges: Robert B. King, Stephanie D. Thacker, DeAndrea Gist Benjamin